UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| v. | )<br>) |
| SAMIRO FUENTEZ, | ) Criminal Action No. 19-37 (RMC)<br>)<br>) |
| Defendant. | )<br>) |

**MEMORANDUM OPINION**

When executing a search warrant for defendant Samiro Fuentez' room as part of an unrelated criminal investigation, Metropolitan Police Department officers found a pistol in a gun box at the bottom of a large laundry bag. The officers seized the pistol. Several months later, they arrested Mr. Fuentez on a charge of felon in possession of a firearm. Mr. Fuentez now moves to suppress the pistol as the product of a warrantless seizure, as well as incriminating statements made after his arrest that the government would reserve for impeachment. Because the pistol was evidence of a crime and because his statements were uncoerced, the Court will deny his motion to suppress the pistol and grant in part and deny in part his motion to suppress his statements.

## I. FACTS[1]

In the course of investigating an alleged sexual assault, the Metropolitan Police Department (MPD) obtained a valid search warrant on November 17, 2017, to search the two-story townhome in Northeast where Mr. Fuentez lived with his family, including minor children. MPD officers executed that warrant four days later, on the morning of November 21, 2017.

---

[1] The facts described are undisputed and taken from the parties' briefs and hearing testimony.

1

They were particularly interested in Mr. Fuentez' bedroom and with collecting biological, electronic, and documentary evidence related to the alleged assault. To that end, the warrant authorized:

> Processing of the crime scene and the collection of evidence, [t]o include photography and diagrams. The collection of DNA, bedding to include gray blanket, washcloths, towels, napkins, all cellular phones, computers, electronic tablets, cameras and video recording equipment, documents that would link Samiro Fuentez to the other suspects in this crime.

Mr. Fuentez was not present for the beginning of the search but his room was identified by his mother.

When the officers entered Mr. Fuentez' room they saw a Glock magazine speed loader on a bedroom bureau and a box of ammunition atop a nearby radiator. While searching for biological materials consistent with the warrant the officers also emptied several large laundry bags, in one of which they found an unlocked gun box with the Glock logo printed on the side. Inside the box was a 9mm Glock 43 pistol with one round in the magazine. *Cf. United States v. Taylor*, 497 F.3d 673, 680 (D.C. Cir. 2007) ("We accordingly reaffirm that gun cases and similar containers support no reasonable expectation of privacy if their contents can be inferred from their outward appearance."). The officers seized the pistol.

Because Mr. Fuentez had a prior felony, he could not legally possess a firearm. 18 U.S.C. § 922(g)(1); D.C. Code § 22-4503. On this basis, MPD obtained an arrest warrant for Mr. Fuentez on May 30, 2018, which they executed without incident on June 3, 2018. Mr. Fuentez was then taken to MPD headquarters where he invoked his *Miranda* rights. However, as two MPD officers were walking Mr. Fuentez to his cell, the three got to talking. At some point during the conversation the officers mentioned that Mr. Fuentez' home had been shot at that morning and asked Mr. Fuentez "what he was going to do about it." Mot. to Suppress

Statements [Dkt. 17] at 1 (quoting discovery disclosures). Mr. Fuentez responded, "That's why I need my gun back." *Id.*

Mr. Fuentez now moves to suppress the pistol and derivative evidence, as well as his statement. The government opposes. The Court held a hearing on November 8, 2019, and received post-hearing supplemental briefing from the parties. The motions are ripe for review.[2]

## II. DISCUSSION

### A. Tangible Evidence

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Time and again" the Supreme Court "has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).

One such exception to the warrant requirement is the plain view doctrine. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). But this exception has conditions. For example, "not only must the item be in plain view; its incriminating character must also be 'immediately apparent.'" *Horton v. California*, 496 U.S. 128, 136 (1990) (quoting *Coolidge*, 403 U.S. at 466). That is to say, the officer must have "probable cause to associate the property with criminal activity." *Texas v. Brown*, 460 U.S. 730, 738 (1983).

---

[2] *See* Mot. to Suppress Tangible & Derivative Evid. [Dkt. 16]; Gov't's Opp'n to Def.'s Mot. to Suppress Tangible Evid. [Dkt. 18]; Gov't's Suppl. Opp'n to Def.'s Mot. to Suppress Tangible Evid. [Dkt. 25]; Samiro Fuentez' Post-Hearing Mem. to Suppress Evid. [Dkt. 26]; Mot. to Suppress Statements; Gov't's Opp'n to Def.'s Mot. to Suppress Statements (Statement Opp'n) [Dkt. 19].

3

Although Mr. Fuentez does not contest that the pistol was in plain view, he argues that the MPD officers did not have probable cause to believe that the pistol was "contraband" so that the seizure was impermissible. More specifically, Mr. Fuentez argues that after *District of Columbia v. Heller*, 554 U.S. 570 (2008) (striking certain D.C. gun-control regulations), pistols are not *per se* contraband in D.C. and the officers did not have probable cause at the time of the search to believe his firearm was unregistered or that he was a felon. The government responds that work performed by MPD Detective Corbett, who was responsible for investigating the alleged sexual assault and was present during the search, made him aware of Mr. Fuentez' felony record when the pistol was seized. The government also argues that the officers properly seized the pistol because, regardless of whether Mr. Fuentez was a felon or the pistol was unregistered, it was unsecured and presented a danger to the minor children living at the residence.

1. *Knowledge of Prior Felonies*

Detective Corbett testified that investigative work he performed before drafting the search warrant made him aware that Mr. Fuentez had a prior felony. That is, Detective Corbett explained that on November 15, 2017, just days before the search, he showed the complainant in the underlying sexual assault case a photo array which included a picture of Mr. Fuentez to confirm Mr. Fuentez' identity as a suspect. Rough Rough Hearing Tr. at 58:1-25.[3] Detective Corbett further explained that he obtained the photo of Mr. Fuentez from the Interstate Identification Index (Triple I), an FBI database which includes arrest photos as well as the criminal records of those in its system. *Id.* at 23:3-7. Detective Corbett thus believes that he learned of Mr. Fuentez' felony status as part of this earlier investigation and knew that fact at the time of the search.

---

[3] The transcript will be finalized and posted on the docket.

This testimony is not uncontested. About two weeks before the hearing, Detective Corbett informed the Assistant United States Attorney (AUSA) that he was not sure whether he knew at the time of the search that Mr. Fuentez had a prior a felony. *Id.* at 60:5-9. He also testified that he had not reviewed any notes or reports between that meeting and the hearing. *Id.* at 63:2-7. Mr. Fuentez cites this testimony and also argues that if his photo had been pulled from an MPD database, instead of the FBI database, his criminal history would not have been included.[4]

The Court credits Detective Corbett. The Detective testified that he remembered that he had pulled Mr. Fuentez' photo from the FBI database after he had talked to the AUSA and pieced together the steps of his investigation of the unrelated sexual assault charge. His recall was confirmed in part by Detective Corbett's affidavit to the search warrant, wherein he stated that he had shown the array to two persons who identified Mr. Fuentz; it was on this basis that the Detective obtained the warrant, obviously prior to the search. The Court finds that Detective Corbett testified credibly that he had initially not remembered the details; that he later realized that he had used Mr. Fuentez' photo in the array and had searched the FBI database to get it; and that the FBI database also contains information about a person's criminal history so that he had learned about Mr. Fuentez' felony conviction at that time. Because this testimony was given two years after the search and Detective Corbett had been investigating a different alleged crime when the gun was found, the Court finds nothing unusual or illogical in Detective Corbett's previous uncertainty about his memory. The Court thus finds that Detective Corbett

---

[4] Although the parties discussed this matter at the hearing, no additional evidence was subsequently submitted during post-hearing briefing.

had probable cause to believe Mr. Fuentez was a felon at the time of the search and that it was appropriate for the officers to seize the pistol.[5]

   2. *Unsafe Firearm Storage*

The government also argues that the officers properly seized the pistol because its storage was not secure, endangering the minor children at the residence. D.C. Code § 7-2507.02 covers the responsibilities of owners when storing their firearms and states:

> No person shall store or keep any firearm on any premises under his control if he knows or reasonably should that a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor unless such person . . . [k]eeps the firearm in a securely locked box, secured container, or in a location which a reasonable person would believe to be secure.

D.C. Code § 7-2507(b). Violation of this statute is a misdemeanor—criminal negligence—and penalties include a fine of not more than $1,000 and imprisonment for not more than 180 days. *Id.* § 7-2507.02(c)(1).

Detective Corbett testified that minor children shared the residence with Mr. Fuentez and provided photographic evidence to that effect. Detective Corbett also testified that the pistol was found, loaded, inside a laundry bag on the floor of Mr. Fuentez' room in an unlocked gun box and with no safety devices attached to the weapon. The government contends that this is enough to establish probable cause for a violation of the D.C. Code.

The Court agrees. The manner in which Mr. Fuentez stored his Glock pistol was not obviously secured from curious children—although the gun was "hidden" in the laundry, ammunition was in plain view, strongly suggesting the presence of a firearm; the laundry bags

---

[5] Detective Corbett further explained that, because Mr. Fuentez was not at home when the search began, he called Mr. Fuentez and promised not to arrest him if he returned to the house to talk, which Mr. Fuentez did. Rough Hearing Tr. at 49:10-15.

6

were readily accessible on the floor of the bedroom; and there were no locks or other safety features protecting the weapon. On these facts, the Court finds probable cause to believe the firearm was not stored safely.[6]

The Court agrees with Mr. Fuentez that a suspected violation of § 7-2507.02 alone does not make a firearm "contraband." *See United States v. Farrell*, 606 F.2d 1341, 1344 (D.C. Cir. 1979) ("Per se contraband is defined as 'objects the possession of which, without more, constitute a crime.'"). Until a person is actually *convicted* of unsafe storage of a firearm he may still legally register and possess firearms in D.C. *See* D.C. Code § 7-2502.03(a)(2), (4)(E). But these facts are irrelevant here. An officer may seize an item if he has "probable cause to believe that the item in question is *evidence of a crime* or is contraband." *Arizona v. Hicks*, 480 U.S. 321, 323 (1987) (emphasis added). In this case, the officers had probable cause to believe the pistol was evidence of criminal negligence and for this reason also properly seized it. *Cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

**B. Statement Suppression**

In *Miranda v. Arizona*, 384 U.S. 436, (1966), the Supreme Court found that the privilege against self-incrimination protects individuals from an "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Pennsylvania v. Muniz*, 496 U.S. 582, 587 (1990) (quoting *Miranda*, 384 U.S. at 461). *Miranda* safeguards are thus required

---

[6] The photograph of a minor child at the home indicates that the officers had their safety in mind at the time, but regardless such is not required for probable cause. *See Whren v. United States*, 517 U.S. 806, 812 (1996) ("Not only have we never held . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.").

when a person in custody is subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). "Interrogation" refers to express questioning and also to any words or actions on the part of the police that the police should know are reasonably likely to elicit incriminating answers. *Id*. at 301. Therefore, these safeguards "come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300-01. When a person invokes their right to remain silent or right to counsel, interrogation must cease. *Edwards v. Arizona*, 451 U.S. 477, 485 (1981).

In this case, the government does not contest that Mr. Fuentez was in custody, that he properly invoked his *Miranda* rights, and that he was nonetheless interrogated. Nor does it argue that Mr. Fuentez waived his *Miranda* rights. Indeed, the government has already agreed that it will not use Mr. Fuentez' statement in its case in chief. However, Mr. Fuentez asks to suppress all uses of his statement and the government argues that it should still be permitted to introduce his statement for impeachment purposes.

"[T]he Supreme Court has held, in no uncertain terms, that a *Miranda* violation alone is insufficient grounds for suppressing statements offered to impeach the defendant's testimony." *United States v. Murdock*, 667 F.3d 1302, 1306 (D.C. Cir. 2012). Notwithstanding, the government must prove that any statement it wishes to introduce—whether in its case in chief or as impeachment—was voluntary. *See id.* at 1305. A statement is only voluntary if it is the "product of an essentially free and unconstrained choice by its maker." *Id.* (internal marks omitted) (quoting *Culombe v. Connecticuit*, 367 U.S. 568, 602 (1961)). Voluntariness is a legal question which turns on a "careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978).

8

Mr. Fuentez asserts that his statement was involuntary because his *Miranda* rights were violated when the MPD officer asked him a question and prompted his answer. That is legally inaccurate. The government more accurately points to the lack of coercion by the officers, that Mr. Fuentez made his statement in the course of a friendly conversation that covered many subjects, and that Mr. Fuentez has experience with the criminal justice system. Whatever the value of the last point, the Court is left with two critical facts: (1) the officers violated Mr. Fuentez' *Miranda* rights; and (2) the entire conversation between the two officers and Mr. Fuentez, as they walked to his cell, was easy and friendly. As a result of the first, the government cannot use Mr. Fuentez' statement in its case in chief. As a result of the second, which demonstrates the lack of coercion, the government can rely on his statement for impeachment.

### III. CONCLUSION

The MPD officers had probable cause to believe the firearm found in Mr. Fuentez' home was evidence of a crime, even if it was not the crime he is charged with now. Mr. Fuentez' later inculpatory statement, though made voluntarily and without coercion or duress, was solicited in violation of his *Miranda* rights. Accordingly, the Court will deny Mr. Fuentez' Motion to Supress Tangible and Derivative Evidence, Dkt. 16, and grant in part and deny in part his Motion to Suppress Statements, Dkt. 17. A memorializing Order accompanies this Memorandum Opinion.

Date: November 25, 2019

ROSEMARY M. COLLYER
United States District Judge